IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RENEE D. GUSTAFSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) 11-cv-5852 |
| v. | ) |
| | ) Hon. John Z. Lee |
| MYRON K. THOMAS, | ) |
| WILLIAM ADKINS, and THE UNITED | ) |
| STATES OF AMERICA d/b/a THE | ) |
| UNITED STATES DEPARTMENT OF | ) |
| VETERAN AFFAIRS, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Defendants Myron Thomas and William Adkins (the "Individual Defendants") have moved for summary judgment as to Plaintiff Renee Gustafson's claims that they surreptitiously placed a recording device in an empty office that she, along with other female coworkers at the Jesse Brown Veterans Affairs ("VA") Medical Center, used as a changing room. Thomas and Adkins do not dispute that they installed the recording device; instead, they contend that federal law provides no remedy for their admittedly illicit actions. The Court, finding itself constrained by the Supreme Court's holding in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), agrees. Accordingly, the Individual Defendants' motion for summary judgment is granted, and all that remains is Gustafson's claim against the United States for spoliation of evidence.

1

## I. Background[1]

During the period of time relevant to this case, Gustafson was a supervisor with the Police and Security Service at the VA Medical Center. Individual Defs.' LR 56.1(a) Stmt. of Facts ("Individual Defs.' SOF") ¶ 1, ECF No. 163. Thomas was the Chief of the Police and Security Service, and Adkins was a detective. *Id.* ¶¶ 2–3.

Adkins, working at the direction of Thomas, installed a camera in an office at the VA Medical Center ("the Old Supervisors' Office") around May 2007. Pl.'s LR 56.1(b)(3)(B) Stmt. of Add'l Facts ("Pl.'s SOAF") ¶ 30, ECF No. 166. Before installing the camera, Adkins consulted with outside sources, who responded that doing so would be illegal. *Id.*; Pl.'s Ex. A, 9/14/09 Mem. ("VA Memo"), at 2, ECF No. 166-1; Pl.'s Ex. B, Seals Dep., at 28:20–29:15, ECF No. 166-5. Adkins informed Thomas of his concern and the responses he received, but was instructed to leave the equipment in place. VA Memo at 2.[2]

At least two female supervisors, including Gustafson, regularly used the Old Supervisors' Office between May 2007 and September 2009 to change their clothing. Individual Defs.' Resp. Pl.'s SOAF ¶¶ 33–34, ECF No. 168. The parties dispute whether Thomas and Adkins were aware of this arrangement. Pl.'s SOAF ¶ 35; Individual Defs.' Resp. Pl.'s SOAF ¶ 35. According to Cherylyn Seals, who at the time was Assistant Chief of the Police and Security Service, it was common knowledge that female supervisors changed in the office. VA Memo at 2; Seals Dep.

---

[1]  The following facts are undisputed except where noted.

[2]  Thomas testified at his deposition that he believed the response Adkins received was that there was "no expectation of privacy" if audio was not captured. Pl.'s Ex. B, Thomas Dep., at 50:3–52:18, ECF No. 166-2.

at 12:16–17, 40:3–23. But both Thomas and Adkins have said they had no reason to know this occurred. VA Memo at 3–4, 7, 9.

According to Adkins, Thomas had told him that the reason for the camera was to investigate the improper sale of merchandise out of the office by a female supervisor. Pl.'s SOAF ¶ 37; Pl.'s Ex. C, Adkins Dep., at 18:10–14, 58:4–18, ECF No. 166-3. Thomas also testified that he had heard some supervisors were sleeping on duty in the office. Individual Defs.' Resp. Pl.'s SOAF ¶ 36; Thomas Dep. at 47:24–48:2.

VA personnel discovered wires, but no camera, in the ceiling of the Old Supervisor's Office in September 2009. Pl.'s SOAF ¶ 31. The wires led into an office that belonged to Thomas, before he left the VA. *Id.*; Individual Defs.' Resp. Pl.'s SOAF ¶ 31; VA Memo at 8.

Once the issue came to light, two criminal investigators were assigned to investigate the incident. Individual Defs.' SOF ¶ 11. They concluded that the equipment had captured an image of a male employee, demonstrating "the possibility that footage could have been captured on the hard drive, viewed, or downloaded onto a CD/DVD with contents that can be construed as excessively intrusive to female or male supervisors." VA Memo at 5.

Gustafson submitted a claim concerning these events to the Office of Worker's Compensation Programs under the Federal Employees' Compensation Act ("FECA"). Her claim was accepted in February 2013. Individual Defs.' SOF ¶ 25.

Gustafson brought this action in August 2011, asserting claims against the Individual Defendants of Fourth Amendment violations under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), and against the United States of America for intrusion upon seclusion. Compl., ECF No. 1. The Court dismissed Gustafson's intrusion upon seclusion claim in light of the government's acceptance of her FECA claim. Individual Defs.' SOF ¶ 26; Tr. of Hr'g at 2:10–19, ECF No. 164.

Gustafson has since filed a third amended complaint, adding a claim against the United States for spoliation of evidence, based on its alleged destruction of digital and physical evidence of the recordings obtained from the camera equipment. 3d Am. Compl., ECF No. 140. Now before the Court is the Individual Defendants' motion for summary judgment as to Gustafson's Fourth Amendment claim.

## II. <u>Legal Standard</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). And the Court must not make credibility determinations or weigh conflicting evidence. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

### III. Analysis

Gustafson's claim under the Fourth Amendment assumes, uncontroversially, that she had a legitimate expectation of privacy in an office she was using as a dressing room. The Individual Defendants, she alleges, violated that expectation of privacy by placing a video camera in the office without her knowledge. Gustafson reasonably infers that the Individual Defendants' purpose in installing the camera was voyeuristic, thus compounding the privacy violation.

An aggrieved plaintiff cannot sue directly under the Fourth Amendment, however. With respect to state officials, a federal statute—42 U.S.C. § 1983—provides an avenue to sue for constitutional violations, including violations of the Fourth Amendment. For claims against federal officials such as Thomas and Adkins, however, the available remedies are far more limited. Gustafson accordingly brings this Fourth Amendment claim under the only mechanism that currently exists for constitutional claims against federal officials: *Bivens*.

*Bivens*, decided by the Supreme Court in 1971, recognized that the Fourth Amendment provided an implied cause of action for a plaintiff, who was subjected to

5

a warrantless search of his home and resulting arrest. 403 U.S. at 389. One might assume, then, that a damages remedy would be available to Gustafson under the Fourth Amendment as well. But the Individual Defendants argue that this case presents a different set of circumstances than *Bivens* and that, therefore, no damages remedy is available, regardless of any privacy violation Gustafson may have suffered.[3]

At the time *Bivens* was decided, the Supreme Court approached the question of whether to imply a cause of action arising out of a violation of a statute—or constitutional provision—in a far more permissive fashion than it does today. "During this '*ancien regime*,' the Court assumed it to be a proper judicial function to 'provide such remedies as are necessary to make effective' a statute's purpose." *Ziglar*, 137 S. Ct. at 1855 (internal citations omitted). Accordingly, in *Bivens*, the Court held that courts must "adjust their remedies so as to grant the necessary relief" when "federally protected rights have been invaded." 403 U.S. at 392. This holding formed the basis of the Court's decision to allow the plaintiff in *Bivens* to pursue a lawsuit against federal officials under the Fourth Amendment, despite the absence of a particular statute or constitutional provision expressly allowing him to do so. *See id.* at 397.

Over the years, however, the Supreme Court has "adopted a far more cautious course before finding implied causes of action." *Ziglar*, 137 S. Ct. at 1855. Outside of the particular factual scenario that gave rise to *Bivens*, the Court now

---

[3] The Individual Defendants also argue that Gustafson is not entitled to reach a jury on her Fourth Amendment claim, because there is no evidence that she was personally captured on camera. As will be seen, it is not necessary to reach this argument.

cautions that the "judicial task [is] limited solely to determining whether Congress intended to create the private right of action asserted." *Id.* at 1856 (quoting *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979)). "If the statute does not itself so provide, a private cause of action will not be created through judicial mandate." *Id.*

Despite these more recent cases, *Bivens* has remained good law, and in fact, the Court has extended its rationale to include two additional contexts. In *Davis v. Passman*, the Court held that a former administrative assistant to a Congressman could sue her former employer under the Fifth Amendment Due Process Clause for firing her because she was a woman. 442 U.S. 228, 230–31 (1979). And in *Carlson v. Green*, the Court allowed a federal prisoner to sue for inadequate medical treatment under the Eighth Amendment. 446 U.S. 14, 16–18 (1980).

Beginning in the 1980s, however, the Supreme Court began to rein in the application of *Bivens*. *See, e.g.*, *Minnecci v. Pollard*, 565 U.S. 118 (2012) (Eighth Amendment suit against private prison guards); *Wilkie v. Robbins*, 551 U.S. 537 (2007) (due process suit against Bureau of Land Management officials); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61 (2001) (Eighth Amendment suit against private prison officials); *FDIC v. Meyer*, 510 U.S. 471 (1994) (due process suit against a federal agency for wrongful termination); *Schweicker v. Chilicky*, 487 U.S. 412 (1988) (due process suit against Social Security officials); *United States v. Stanley*, 483 U.S. 669 (1987) (due process suit against military officials); *Bush v. Lucas*, 462 U.S. 367 (1983) (First Amendment suit by a federal employee against his employer); *Chappell v. Wallace*, 462 U.S. 296 (1983) (race-discrimination suit against military

7

officers). With each of these decisions, the type of claims permissible under *Bivens* has narrowed. So much so that, in *Ashcroft v. Iqbal*, the Court explained that expanding the *Bivens* remedy is now "disfavored." 556 U.S. 662, 675 (2009).

Most recently, in *Ziglar*, the Supreme Court reiterated its reluctance to imply a private remedy for damages absent specific statutory or constitutional authority. The ultimate question, it explained, is "who should decide whether to provide for a damages remedy, Congress or the courts?" 137 S. Ct. at 1857 (internal quotation marks and citation omitted). "The answer most often will be Congress." *Id.* Still, implying a damages remedy is possible, so long as the following elements are satisfied.

First, the court must determine whether the case before it arises in a new *Bivens* "context"—in other words, whether it falls within the categories of implied causes of action previously recognized by *Bivens*, *Davis*, and *Carlson*. *Ziglar*, 137 S. Ct. at 1859–60. These categories, as explained by the Supreme Court, are defined narrowly: "a claim against FBI agents for handcuffing a man in his own home without a warrant" (*Bivens*); "a claim against a Congressman for firing his female secretary" (*Davis*); and "a claim against prison officials for failure to treat an inmate's asthma" (*Carlson*). *Id.*

To determine whether the case at hand presents an established or novel context, the court should look to "the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be

confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider." *Id.* This list, however, is not exhaustive, and the court must endeavor to determine if the case is different from previous *Bivens* cases in any "meaningful way." *Id.*

If the case involves facts that present a new *Bivens* context, the court must go on to consider whether any "special factors" counsel hesitation from implying a damages remedy, or "cause[ ] a court to pause before acting without express congressional authorization." *Id.* at 1858. A particularly strong factor requiring hesitation is the existence of an "alternative remedial structure." *Id.* And in *Ziglar*, the Court made clear that, to qualify, an alternative remedy need not provide the same or even similar relief. *Id.* at 1862–63. There, the plaintiffs were immigrant detainees held indefinitely on suspicion of terrorism after the September 11 attacks, who filed claims challenging the conditions of their confinement under the Fourth and Fifth Amendments. The Supreme Court held that either injunctive relief or *habeas corpus* was a sufficient alternative remedy that foreclosed a *Bivens* claim. *Id.*

Here, the Court concludes that this case presents a new *Bivens* context. The closest analogue is *Bivens* itself, and Gustafson argues that this case falls within its contours. But, as the Individual Defendants point out, the federal employment

9

context in which this case arises distinguishes it from *Bivens*.[4] First, the rank of the officers is different than those in *Bivens*, because Gustafson *herself* was a federal officer. Accordingly, while *Bivens* addressed the prototypical law enforcement invasion of a private home, this case addresses the far more unique (though no less disturbing) situation of a federal employee who was unknowingly watched by her supervisor while she was undressing. For that reason, judicial guidance into these circumstances is limited. Furthermore, unlike a situation involving law enforcement's intrusion into a residence, in this case, there is a substantial risk of inappropriate judicial intrusion into the employment activities of the executive branch, as well as into Congress's role in regulating federal employment.

In response, Gustafson points to the theory offered by the Individual Defendants that the camera was installed for the purpose of investigating improper sales being conducted out of the Old Supervisors' Office. This, she says, supports the notion that the installation of the camera was for a law-enforcement purpose—just as in *Bivens*. But that argument only goes so far.

For one thing, it is entirely inconsistent with Gustafson's underlying theory of the case, which is that the camera was installed for *non*-law enforcement, voyeuristic purposes. If her proposition proves correct, the circumstances certainly fall outside of the context of *Bivens*. But even if the Individual Defendants' theory

---

[4] Although *Davis* concerned federal employment, that case also presented a different context than this one, because it arose in the context of a due process claim, not a claim for illegal search and seizure. *See* 442 U.S. at 230–31. Furthermore, the *Davis* court apparently did not consider federal employment as a special factor, but more recent cases counsel that it is a factor that should be taken into account. *See Bush*, 462 U.S at 388–89.

were to prevail, it still describes a search that is significantly different than the one committed in *Bivens*, and the claim continues to present thorny issues regarding undue judicial intrusion into the affairs of the Executive Branch.

Concluding that this case presents a new *Bivens* context, the Court turns to the issue of whether a *Bivens* remedy should be implied anyway. The Individual Defendants propose several factors counseling hesitation from such a ruling. First, they point out, an alternative remedy exists in the form of FECA, from which Gustafson has already benefited. This is correct. "[FECA] provides a comprehensive system of compensation for federal employees who sustain work-related injuries." *United States v. Lorenzetti*, 467 U.S. 167, 169 (1984). And Gustafson does not dispute that her FECA claim concerning these events was accepted.

Instead, she contends, FECA does not provide an adequate remedy against the Individual Defendants, because FECA provides a remedy only against the United States itself. This point is well-taken—FECA leaves Gustafson with no way to challenge Thomas or Adkins personally for their actions. Unfortunately for Gustafson, however, *Ziglar* forecloses this argument. *See* 137 S. Ct. at 1862–63.

Under controlling law, *any* substantial remedy for the harm suffered by a plaintiff—whether or not it provides the same relief against the same actors—weighs against the recognition of a new *Bivens* claim. *See id; Fazaga v. FBI*, 916 F.3d 1202, 1243 (9th Cir. 2019) ("[T]he lack of relief against some potential defendants does not disqualify . . . an alternative remedial scheme."); *see also Terry*

11

*v. Newell*, No. CV-12-02659-PHX-DGC, 2013 WL 6048914, at *3–4 (D. Ariz. Nov. 15, 2013) (pre-*Ziglar* case holding that FECA was an adequate alternative remedy counseling hesitation against allowing a *Bivens* claim to go forward); *Richards v. CIA*, 837 F. Supp. 2d 574, 577–79 (E.D. Va. 2011) (same); *Rivera v. Smith*, No. 1:10-CV-01015, 2011 WL 902097, at *4 (E.D. Cal. Mar. 15, 2011) (same); *Briscoe v. Potter*, 355 F. Supp. 2d 30, 38–42 (D.D.C. 2004) (same); *Richmond v. Potter*, No. 03-00018, 2004 WL 5366540, at *14 (D.D.C. Sept. 30, 2004) (same and collecting cases).[5] Here, Gustafson was able to obtain relief under FECA, even though it may not have been against the perpetrators personally.

Next, the Individual Defendants point out that the existence of FECA—as well as other regulatory schemes for federal workers—further counsels hesitation here. They are correct. The Supreme Court already has signaled that Gustafson's federal employment is a special factor that the Court must take into account. In *Bush v. Lucas*, a First Amendment case, the Court explained that because the plaintiff's claims "arise out of an employment relationship that is governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States . . . it would be inappropriate . . . to supplement that regulatory scheme with a new judicial remedy." 462 U.S at 368. The federal-employment regulatory scheme includes not just FECA but also the Civil Service

---

[5] The Seventh Circuit previously held in this case that FECA did not preclude Gustafson's *Bivens* claim. *See generally Gustafson v. Adkins*, 803 F.3d 883 (7th Cir. 2015). That decision does not control here, however, because the Seventh Circuit did not have the benefit of *Ziglar*, which was decided two years later. Additionally, it was considering the question of whether FECA, as the exclusive remedy against the United States for workplace injuries, *barred* Gustafson's *Bivens* claim—a different inquiry than the one at issue here.

12

Reform Act ("CSRA"), which "constitutes a comprehensive system for reviewing personnel action[s] taken against federal employees." *Gonzalez v. Velez*, 864 F.3d 45, 51 (1st Cir. 2017) (quoting *United States v. Fausto*, 484 U.S. 439, 455 (1988)). Taken together, the FECA and the CSRA occupy much of the field of federal employment litigation, and courts should exercise caution before creating remedies that do not already exist by statute.

What is more, in *Bush*, the Supreme Court explained that "Congress is in a far better position than a court to evaluate the impact of a new species of litigation between federal employees. . . . Not only has Congress developed considerable familiarity with balancing governmental efficiency and the rights of employees, but it also may inform itself through fact finding procedures such as hearings that are not available to the courts." 462 U.S. at 389. That reasoning applies equally here. As a court in the Eastern District of Virginia has remarked, "Congress created FECA to provide compensation for workplace injuries and it is specifically designed to strike a balance between the federal employee's welfare and the government's sovereign immunity." *Richards*, 837 F. Supp. 2d at 577. Although it is true that FECA does not necessarily bar a suit against individual co-employees, *see Gustafson*, 803 F.3d at 890, the comprehensive statutory scheme enacted by Congress to govern federal employment is another factor that weighs against the recognition of an implied constitutional cause of action here.

Lastly, the Individual Defendants raise the possibility of state tort law providing an alternative remedy for Gustafson. As they point out, Gustafson

13

originally set forth a claim for intrusion into seclusion—but only as to the United States, not the Individual Defendants. The Court does not see why Gustafson could not have sued the Individual Defendants under such a theory, or other state privacy laws.

For her part, Gustafson argues that there is one factor counseling *against* hesitation—the fact that this suit is aimed at the bad actions of individual federal officials, as opposed to formal executive policies. True enough, the Supreme Court's holding in *Ziglar* was focused on preventing *Bivens* from becoming a mechanism for challenging executive policy. *See* 137 S. Ct. at 1860–61. But the Court did not stop there; instead, it described how rarely courts should imply new *Bivens* remedies, established factors that a court should consider before recognizing such new remedies, and described a variety of special factors that may counsel against creating them. *See generally id.* at 1854–63. The fact that this case is aimed at the wrongdoing of individuals as opposed to the policies of the VA does not eliminate the significant reasons for hesitation already discussed.

Given what Gustafson faced at the hands of her male colleagues, this may be a cruel and unsatisfying outcome, but that is the state of the law, and the Court is duty bound to accept it. The scope of *Bivens* has been limited over time, and, after *Ziglar*, seems to go little further than its own facts. Because the previously recognized *Bivens* contexts are significantly different from the scenario at hand, and because there are factors counseling at least some hesitation, the Court concludes there is no implied remedy under the Fourth Amendment available to Gustafson.

Unless and until Congress provides a private cause of action for serious deprivations of constitutional rights by federal officials, many plaintiffs like Gustafson may be left without any meaningful remedy. But, as the Supreme Court explained in *Ziglar*, closing this loophole is the prerogative of Congress, not the federal courts.

## Conclusion

For the reasons stated herein, the Individual Defendants' motion for summary judgment is granted. A status hearing is set for 5/19/20 at 9:00 a.m. to set a schedule for trial and pretrial matters with respect to Gustafson's remaining claim against the United States for spoliation of evidence.


**IT IS SO ORDERED.**                    ENTERED:  3/31/20

*[signature: John Z. Lee]*

_____
**JOHN Z. LEE**
**United States District Judge**